**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **LAURA SKOP** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **FILE NO.:   1:05-CV-1754-BBM** |
| | : | |
| **CITY OF ATLANTA, GEORGIA,** | : | |
| **OFFICER TIMOTHY BROWN,** | : | |
| **in his individual capacity, &** | : | |
| **SERGEANT THOMAS L.** | : | |
| **PADGETT, in his individual** | : | |
| **capacity,** | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF LAURA SKOP'S STATEMENT OF MATERIAL FACTS TO WHICH
THERE REMAINS A GENUINE ISSUE TO BE TRIED**

Pursuant to Local Rule 56.1(B)(2)(b), Plaintiff Laura Skop (hereinafter "Skop") files

her Statement of Material Facts to Which There Remains a Genuine Issue to Be Tried[1], as

follows:

**LAURA LEE SKOP**

1.      Skop is 5'6" tall and weighs 130 pounds. [Declaration of Laura Lee Skop, ¶ 2, attached

hereto as Exhibit "A", hereinafter cited as Skop Dec., ¶ " "].

---

[1] Citations to the record herein will be as follows:  (I) Citations to documentary exhibits
attached hereto will appear as "Skop SMF, Ex. "#"; (ii) Citations to deposition testimony will
initially appear as  (Deposition of [Name of Deponent], p. #, attached hereto as Exhibit "#",
hereinafter cited as [Name of Deponent] Dep. p. "#").

2.      Skop attended The Georgia Institute of Technology from 1980 to 1984.   She graduated with a Bachelor of Science in Industrial Engineering.  [Skop Dec. ¶ 4].

3.      Skop is a technology consultant.  She has held a variety of different positions with consulting firms in the Atlanta area.  [Skop Dec. ¶5].

4.      Prior to this incident, Skop had little or no direct involvement with law enforcement. She had never been the victim of a serious crime.  She had never been charged or convicted of any crime at all, other than minor traffic violations.    [Skop Dec. ¶ 6]. Skop had always held the law enforcement community in the highest regard.  [Skop Dec. ¶ 7].

### DEFENDANT OFFICER TIMOTHY BROWN

5.      Officer Timothy Brown (hereinafter "Brown") is twenty-nine (29) years old and is currently employed as a police officer with the City of Atlanta Police Department. Brown is 5'10" tall and weighs 185 pounds. [Deposition of Timothy Brown, p. 9 attached hereto as Exhibit "B", hereinafter cited as Brown Dep., p. " "].

6.      Brown graduated from high school in 1994.  Brown worked as a Jailer with the Williams County Sheriff's Department in Tennessee for two (2) years.  He was not a certified law enforcement officer in the State of Tennessee. [Brown Dep., p. 12]. [See Brown Dep., pp. 23-24; Ex. 37]

7.   Brown came to work for the police department on August 15, 2000 as a police officer recruit. [Brown Dep., p. 25].  He then graduated from the Atlanta Police Academy on May 15, 2001. [Brown Dep., p. 26].  Brown has never been promoted during the course of his career in Atlanta.  [Brown Dep., pp. 26-27].

8.   Other than basic mandate, which he completed in 2000 - 2001, Brown's subsequent training leading up to the events of July 10, 2003 consisted of classes like Weapons of Mass Destruction, Patrol Investigative Techniques, and Civil Disturbances. [Brown Dep., p. 33; Ex. "40"].

9.   The only training he ever received on how to direct traffic or how to manage emergency weather situations came during basic mandate training.  As with regard to handling weather related emergencies, the extent of Brown's training was to arrive at the scene as was to "basically arrive on the scene and try to render the scene safe." [Brown Dep., pp. 32-33].

10.   He has no recollection of how much of the 900 hours he spent in training was devoted to this particular task. [Brown Dep., p. 33].

11.   In the in-service training classes he attended prior to July 10, 2003, none of the training he received had anything to do with handling police/citizen encounters during weather related emergencies. [Brown Dep., p. 34].

12.    The materials provided to new recruits like Brown by the Police Academy during the basic mandate training on the mechanics of arrest have nothing at all to do with handling weather related emergencies. [See Ex. "50"].

13.    The class taught during mandate on traffic direction and control similarly has nothing at all to do with directing traffic during a weather related emergencies. [Brown Dep., pp. 152-153]; Ex. "67"].  To Brown's recollection, he never received any training on how to "direct traffic around a hazardous area" or interact with citizens under such circumstances.  [Brown Dep., pp. 153-154].

14.    None of the roll call training issues considered by officers in Zone 2 had anything at all to do with handling weather related emergencies or police/citizen encounters in non-criminal situations, such as those facing Brown on July 10, 2003. [Ex. "68"].

15.    Prior to July 10, 2003, Brown had four (4) separate OPS Complaints brought against him in his first year as a police officer.  He was exonerated for one (1), and in two (2) others, the evidence was insufficient to sustain the charges.  He had been disciplined less than two (2) years earlier for violation of Rule 2.33 – Conformance with Directives – for failing to advise a supervisor about a use of force during an arrest.  He had also had a sustained OPS infraction for a vehicle accident. [Ex. "42"; Brown Dep., pp. 43].

**DEFENDANT SERGEANT THOMAS PADGETT**

16.  Thomas L. Padgett (hereinafter "Padgett") has been employed by the City of Atlanta Police Department since November, 1989. He is currently assigned as an evening watch commander at the airport.[Deposition of Thomas L. Padgett, p. 4, attached hereto as Exhibit "C", hereinafter cited as Padgett Dep., p. " "]

17.  He was promoted to Sergeant in October, 1996.  Padgett was transferred to Zone 2 in late 1999, early 2000 and essentially remained there until his promotion to Lieutenant in 2004.  [Padgett Dep., pp. 22-23].

18.  He was the highest ranking officer on duty in Zone 2 during the evening watch. [Padgett Dep., p. 43].  In that capacity, he was essentially charged with commanding the evening shift for Zone 2 on July 10, 2003.  [Padgett Dep., p. 20].

**THE NEIGHBORHOOD – MIDDLESEX AVENUE IN MORNINGSIDE**

19.  Skop lives in a single family residence located at 1375 Middlesex Avenue in the Morningside neighborhood of Atlanta. [Skop Dec. ¶ 8; Ex. "81" & "82"].  Her garage is located directly below the main floor of her home. [Ex. "81"].

20.  Skop has lived in her home for twenty-one (21) years.   She is a single woman, so when she arrives home in her car, she feels safer pulling into her garage, waiting for her driveway gate to close, and lowering her garage door before she gets out of her car. {Skop Dec., ¶ 9].

21.   On July 10, 2003, Skop's mailbox was located at the end of her driveway.  The street
      number of her home was affixed to her mailbox in plain view.  [Skop Dec. ¶ 10; Ex.
      "80"].

22.   On July 10, 2003, there was a street sign at the corner of Middlesex Avenue and
      Hillpine Drive.  This intersection is just three houses away from Skop's home. [Skop
      Dec. ¶ 11; Ex. "79"].

23.   Charlie Schroder is one of Skop's neighbors.   Mr. Schroder has lived at 1385
      Middlesex Avenue for approximately fifteen (15) years.  His residence is located two
      houses up the street from Skop's at the intersection of Hillpine Drive and Middlesex
      Avenue. [Skop Dec., ¶ 14;  Ex. "4"].

24.   Doug Kollme is one of Skop's neighbors.  Mr. Kollme has owned his residence at
      1367 Middlesex Avenue for several years.  His residence is located directly to the left
      of Skop's house.  Skop's driveway separates their homes. [ Skop Dec., ¶ 15; Ex. "4"].

25.   Dr. John Lloyd is one of Skop's neighbors.  Dr. Lloyd has lived at 1358 Middlesex
      Avenue for approximately ten years.  His residence is located three houses down from
      Skop's on the opposite side of the street. [ Skop Dec., ¶ 16; Ex. "4"].

26.   The electric, cable and telephone lines in the neighborhood run along the opposite
      side of Skop's street on wooden poles. [Skop Dec., ¶ 17].  The electric, cable and
      telephone lines that connect to Skop's house hang over Middlesex Avenue and attach

to a wooden pole that stands next to her mailbox. [Skop Dec., ¶ 17, Ex. "83"].

27.    On July 10, 2003 at the time of the incident, the wooden pole located in Skop's yard remained standing, with the electric, cable and telephone lines properly attached and hanging at their regular height.  The wooden pole on the opposite side of the street closest to Skop's residence was also standing, with the electric, cable and telephone lines properly attached and hanging at their regular height. [Skop Dec., ¶ 18].

28.    On July 10, 2003, a large tree that had stood in Dr. Lloyd's yard fell across Middlesex Avenue during a storm. [Ex. "59," "16"].   Dr. Lloyd surveyed the damage after the storm passed.

The utility pole in my front yard was the only pole, which was damaged.  The only power line that was significantly lower were the one in front of my house and the one across the street but one could walk under it in front of my house. The cable and phone line and addition to some limbs were low enough to block people from walking from my driveway and across the street but nowhere else.

[Ex. "59"].

29.    Dr. Lloyd also saw a "gentleman [he] did not recognize [come] over and [move] some of the wires in my yard before the police arrived." [Ex. "59"].

30.    Dr. Lloyd also knew that "by the time the officer [Brown] had arrived tree cutters had already surveyed the area and it was clear which lines were electric and which were phone and cable.  The electric lines were still above everyone's heads." [Ex. "16"].

### JULY 10TH, 2003 – THE INCIDENT

31.   On July 10, 2003, Skop went to work at Venturi in accordance with her normal schedule. In the late-afternoon, she became aware that a series of violent thunderstorms were crossing through the Atlanta area. She left the office a little early because she knew that the highway would likely be congested due to the weather. [Skop Dec., ¶20].

32.   As she drove home on her normal route, it was raining hard. The streets were wet. She drove down Monroe Drive through the intersection with Piedmont Road, took a left turn on Hillpine Drive, traveled up Hillpine Drive, and turned right on Middlesex Avenue. [Skop Dec., ¶ 21].

33.   It was still raining hard when she turned on Middlesex Avenue. She immediately noticed a City of Atlanta Police patrol vehicle parked diagonally across the street just beyond her driveway. The patrol vehicle's emergency lights were activated, but there was no officer in sight.

34.   The patrol vehicle was occupied by Defendant Timothy Brown ["hereinafter "Brown"]. [Ex. "3"]

35.   Brown was on routine patrol when he observed the fallen tree on Middlesex Avenue. His unit number was 3210. [Ex. "2," p. 1]. Brown radioed dispatch shortly after 17:25:15 and stated,

| | |
|---|---|
| 3210: | 3210 radio |
| Dispatcher: | 3210 go ahead |
| 3210: | 3210  26 [Arrived at call] at 700 Hillpine, there is a tree down . . . show me out over here on Winslow with 205. |
| Dispatcher: | I copy, pull in code 12[2] on it? |
| 3210: | you can show that code 12 on that 31[3], but hold me on the one with 205 [Officer Fernandez]. |

[Ex. "3"].

36.     Brown knew that Officer Fernandez was nowhere near Hillpine and he also knew

exactly where he was – the 1300 block of Middlesex Avenue.  [Ex. "3," p. 1].

Fernandez was located at a different fallen tree at 2620 Winslow Drive in Buckhead

with the Fire Department officials who had also responded to that scene. [Ex. "4"; Ex.

"35," p. 5].

37.     When Brown first arrived on the scene, he interacted with several residents of

Middlesex Avenue, including Dr. Lloyd.  Brown viewed these citizens as  "subjects

" who needed to leave the vicinity of the fallen tree. [Brown Dep., pp. 101-102; 103-

108].  He issued those orders without making any effort to communicate with any of

the citizens about what they knew.  [Brown Dep., p. 103-108].

---

[2] Code 12 – This code is a pull in when an officer responds to a call or pulled out on a call where an investigation has taken place and no arrest or report has been made.

[3] Code 31 – The call involves utility wires that are down.  The officer upon receiving or pulling out a signal 31 should not attempt to "fix" the situation, but make the scene safe, attempt to determine the type of wire, and advise the Communications dispatcher to contact the appropriate utility.

38.  Without contacting Georgia Power or his supervisor as required by department policy, Brown elected to "close" Middlesex Avenue by blocking the street just to the South of Skop's driveway. [Brown Dep., pp. 104-105; 96-97, compare, Ex. 46, §§ 3.6.2, 3.5.2]. Brown wanted some down time to do his paperwork. [Brown Dep., pp. 110-11; 136; 145].

39.  She also noticed that the fallen tree lying perpendicularly across Middlesex Avenue by Dr. Lloyd's home and well beyond the patrol vehicle. [Skop Dec., ¶ 23; Ex. "77," "78"].

40.  The distance from the area where the tree was located to the edge of Skop's driveway closest to Dr. Lloyd's residence was approximately 110.8 feet. The distance to the far edge of her driveway was approximately 127 feet. [Skop Dec., ¶ 24].

41.  As Skop tried to turn into her driveway, she realized that the patrol vehicle was slightly blocking the driveway. The patrol vehicle needed to pull up about a foot so that she could safely enter her driveway without striking the rear bumper of the patrol car. [Skop Dec., ¶ 27; Ex. "8," & "9"].

42.  She put her turn signal on to alert the officer sitting in the patrol vehicle that she wanted to enter the driveway directly behind his vehicle. [Skop Dec, ¶ 28].

43.  The patrol vehicle did not move, so Skop honked her horn. She still got no response. She began to wonder if there was anyone inside the patrol vehicle. [Skop, Dec. ¶ 30].

44. She rolled down her passenger window.  The officer then rolled down his passenger window.  That is when she knew there was actually someone in the patrol vehicle. [Skop, Dec. ¶ 31].

45. She could not see the officer and could not hear whether he was saying anything to her.  She said something to the effect of "I just need to get into my driveway."  She was not sure whether the officer could hear her.  She tried to communicate to the officer this way several times.  But he did not move. [Skop, Dec. ¶ 32].

46. She was anxious to get inside her home because of the dangerous weather conditions. She did not know how else to communicate with the officer, so she decided to get out of her car to go speak with him.  [Skop, Dec. ¶ 33].

47. Before she got out of her car, she turned off the engine.  When she got out, she closed her car door because it was pouring rain.  [Compare, Ex. 6; Brown Dep., p. 210; Padgett Dep., p. 69].   She approached the driver's side of the patrol vehicle.  She stood there for a moment, but the officer did not acknowledge her, so she knocked on the driver's window. [Skop Dec., ¶ 34].

48. The officer rolled down his window.  Before Skop could say anything, he yelled, "can't you see there is a tree down and this is a hazardous area?"  He rolled up his window without giving her a chance to respond. He sounded  angry.  [Skop Dec., ¶ 34].

49.   She stood there for a moment, then knocked on the window again.  The officer rolled down his window again and, in a louder voice, yelled again that there was a tree down.  He rolled up his window a second time without giving her a chance to respond.  [Skop Dec., ¶ 36].

50.   Throughout this entire encounter, Brown was not outside his vehicle actively directing traffic.  He was doing paperwork.  [Brown Dep., pp. 110-11; 136; 145].  Other than his initial encounter with the neighbors when he first arrived, he had not turned away any other vehicles and or seen anyone other than Skop. [Brown Dep., pp. 190-192; compare Ex. "54"].

51.   Skop was standing in the rain.  She was confused and upset.  She could not understand why the officer simply refused to communicate with her.  [Skop Dec., ¶ 37; Ex. "10"].  She said, "can I get your name and badge number?"  [Skop Dec., ¶ 40].

52.   The officer immediately got out of the patrol vehicle, slammed the door, and yelled, "do you realize I can arrest you for obstruction?"  [Skop Dec., ¶ 41].

53.   Skop was in a state of disbelief.  Brown stepped towards her.  She backed away from him.  She asked him, "how can you arrest me?  This is my driveway.  I just need you to pull up a foot."  She was pointing down at her driveway.   [Skop Dec., ¶ 41].  Brown kept advancing towards Skop.  He was visibly angry.  He was reaching for

his handcuffs.  [Skop Dec., ¶ 43].

54.   Skop backed into Mr. Kollme's yard.  She felt like she was being abducted.  She asked if she could get her neighbor to witness her arrest.  [Skop Dec., ¶ 43].

55.   As she turned and took a couple of steps towards Mr. Kollme's residence,   Mr. Kollme was just coming outside.  He had witnessed the entire scene. [Ex. "58"].  Brown's demeanor appeared "inflexible" to Mr. Kolme. [Ex. "58"].

56.   Brown grabbed Skop's arm, twisted her around, handcuffed her, and pushed her into the back of his patrol vehicle. [Skop Dec., ¶ 45; Ex. "58", p. 2 ("I saw him grab her arm . . . in my front yard.").

57.   Mr. Kollme tried to talk to Brown.  Skop could not hear everything that was said, but she does remember Kollme ask the officer if he could get her car keys so that he could park her car and take care of her dog. [Skop Dec., ¶ 46].

58.   When Brown got back in the patrol vehicle, Skop was in tears.  She asked him, "please don't arrest me." [Skop Dec., ¶ 47].

59.   Brown responded that, "[Skop going to jail; that [she] would have to "bond out;" that he was going to "impound her car;" and that he could not believe that "[she] obstructed him." He was very angry and threatening. He kept saying "you obstructed me" over and over again. [Skop Dec., ¶ 48].  Skop was afraid to respond unless Brown asked her a direct question.  When she tried to say anything, it just seemed to

make him angrier.  [Skop Dec., ¶ 48].

60.   Throughout the incident, Brown never asked Skop where she lived.   [Skop Dec., ¶ 50].  But by the time he arrested her, Brown knew where she lived. [Brown Dep., p. 98].

61.   Skop would have told Brown directly, if he had bothered to ask.  Her car was turned to enter her driveway, her blinker was on, she had repeatedly gestured toward her driveway, and she told him that she was trying to get into her driveway. [Skop Dec., ¶ 50].

62.   Brown spoke to Padgett on his cell phone.   He told Padgett about the situation and that he had arrested Skop for obstruction.  Padgett suggested that Brown should charge Skop with Failing to Obey an Officer Directing Traffic.   Padgett readily assented to Brown's request that he be permitted to impound Skop's car. [Brown Dep., p. 202; 210-213; Padgett Dep., p. 71].

63.   When Brown filled out the citations, he first completed a citation for Failure to Obey an Officer Directing Traffic, then Obstruction. [Ex. "5"].

64.   Padgett realized that Brown had acted without probable cause in arresting Skop for obstruction, so he helped cover up Brown's mistake by recommending that he first charge her with Failure to Obey an Officer Directing Traffic. [Brown Dep., p. 202; 210-213; Padgett Dep., p. 71; Ex. "5" ].

65.     Mr. Schroder approached the patrol vehicle a short time later. [Ex. "62 "].  He tried

to speak with Brown.  He asked if he could move Skop's car.  Brown told him that he

had Skop in his custody.  Mr. Schroder was shocked by Brown's tone and aggressive

nature; he was afraid that he would be arrested too if he tried to talk to Brown any

further. [Ex. "62"; Brown Dep., pp. 222-223].

66.     Skop was wearing a blue cotton blouse and khaki pants.  She was wet and cold from

the rain when Brown placed me under arrest around 6:00 p.m.  She remained in

Brown's immediate presence for over two hours, yet he never offered her a towel, dry

shirt, or other covering. [Skop Dec., ¶ 57; Brown Dep., p. 229-230].

67.     Padgett never offered to loosen Skop's handcuffs. [Skop Dec., ¶ 62].

68.     Padgett discussed the arrest with Brown at the station.  Padgett told Brown that,

"legally [you] may have been right, but did [you] have to do it?" [Padgett Dep., p.

148].

69.     Padgett had an affirmative duty as Brown's supervisor to ensure that the arrest was

lawful. [Padgett Dep., p. 175-176].

70.     Padgett had the authority to order Skop's release. [Padgett Dep., p. ,

71.     Padgett had reason to be concerned about the arrest, especially after Brown told him

that he was afraid that he might get sued. [Padgett Dep., p. 175-76].

72.   Padgett failed to intervene to liberate Skop.  Instead, he helped Brown prepare his

Incident Report and cover up Skop's illegal arrest.  [Padgett Dep., p. 95-96].

73.   Even though Brown could have released Skop at the scene, he elected to keep her in

custody because he was afraid that he or the department might get sued.  He kept her

under arrest because he had "already put [his] hands on her." [Brown Dep., p. 216-

217].

74.   Skop remained in custody from approximately 6:00 p.m. on July 10, 2003 until 3:10

a.m. on July 11, 2003.   [Skop Dec., ¶¶ 57; 65].

### OBJECTIVELY REASONABLE OFFICER

75.   Upon arriving at the scene, an objectively reasonable officer responding to the scene

of a fallen tree on Middlesex Avenue on July 10, 2003 would first secure the scene

and then make an effort to find out what kind of lines were downed by the tree by

speaking to the neighbors and by calling Georgia Power. [Deposition of Joseph P.

Spillane, pp. 67-71, attached hereto as Exhibit "E", hereinafter cited as Spillane Dep.,

p. " "; Deposition of Welcome Harris, Jr., pp. 47-48, 61-62, attached hereto as Exhibit

"D", hereinafter cited as Harris Dep., p. " "].

76.   As Major Spillane explained,

> He's there to make the scene safe if he can; if he can't, to act as
> an ambassador, if you want to use the word, to the City or for
> the citizens for the City to prevent any further damage to
> property or persons in the area.  Yes."

[Spillane Dep., pp. 85-87].

77.    An objectively reasonable officer under the totality of the circumstances confronting Brown would show maturity and a professional attitude in communicating in a polite manner with neighbors.  [Spillane Dep., pp. 86-87; Harris Dep., pp. 61-62].

78.    An objectively reasonable officer under the totality of the circumstances that Brown faced when Skop attempted to communicate with him about entering her driveway would have, at a minimum, asked where she lived on the street. [Harris Dep., pp. 66-67].  As Major Spillane observed, a reasonable officer would do that,

> In order to help them try to get where they're going, cause in some case you may have someone turn down the street that doesn't need to drive down the street, but that's the only way they know home; so you have to explain to them how to get to the other side of Middlesex Avenue somehow as a police officer.

[Spillane Dep., p. 90].

79.    An objectively reasonable officer under the totality of the circumstances confronting Brown on July 10, 2003 when Skop first approached him would "talk to Ms. Skop and find out what she wanted, why she was attempting to drive down the street."  An objectively reasonable officer would ask questions like, "can I help you? Where are you trying to go?"  [Spillane Dep., pp. 93-94; Harris Dep., pp. 67-68].

80.     An objectively reasonable officer under the totality of the circumstances confronting Brown on July 10, 2003 when Skop indicated she was trying to get into her driveway would ask, "where do you live or where is your driveway?" [Spillane Dep., pp 94, 98-99].

81.     Under the totality of the circumstances confronting Brown when Skop first pulled up behind his vehicle on July 10, 2003, an objectively reasonable officer would have exited his vehicle, approached Skop's vehicle and asked her what her purpose was for being on Middlesex Avenue. [Spillane Dep., pp. 101-102].

82.     Under the totality of the circumstances confronting Brown when Skop first pulled up behind his vehicle on July 10, 2003, Skop's request that she be allowed to pull into her driveway was reasonable. [Spillane Dep., p. 102].

83.     Under the totality of the circumstances facing Brown on July 10, 2003, his orders to Skop that, "the road was closed, that she should park her car and walk to her residence" were "not reasonable." [Spillane Dep., p. 95-98].

84.     When Brown refused to move his vehicle when Skop first tried to approach him, Skop was well "within her right as a citizen to inquire whatever she wanted to inquire of the officer, continue the dialog with the officer." [Spillane Dep., pp. 107-108].

85.     Under the totality of the circumstances confronting Brown on July 10, 2003, an objectively reasonable officer in his position would have known that no probable

cause existed to place Skop under arrest.  [Spillane Dep., pp. 97-99; Harris Dep., pp. 72-73].

86.    As Welcome Harris admitted,   *It would be hard for me to see it."* [Harris Dep., p. 73].

87.    Under the totality of the circumstances confronting Brown throughout the incident with Skop, it would not have endangered him or her or otherwise affected Brown in any way if he simply pulled his patrol car up "slightly" to allow her into her driveway. [Spillane Dep., p. 103; 113; Ex. 55, pp. 13-14].

88.    Spillane was the Commander of Zone 2 at the time.  He looked into the incident based on Mr. Schroder's complaint.

> My question was to the reasonableness of the entire situation, given the totality of the circumstances. My concern as the commander of Zone 2 with this was not that it was legal or illegal to have Ms. Skop park her car and walk, but whether it was reasonable to me and whether as a citizen I would want to be treated like that.

[Spillane Dep., p. 107].

89.    Under normal circumstances, the issuance of a citation in the City of Atlanta does not require somebody to make a bond.  Police officers typically just give the tickets to the defendant and allow them to appear in court later.  [Spillane Dep., pp. 110-111].

90.    An objectively reasonable supervising officer in the position of Padgett on July 10,

2003 had a duty to ascertain whether Brown in fact had probable cause to make his arrest of Skop. [Harris Dep., p. 87].

91.   I qualified for a "recognizance bond." As a condition of my bond, I was ordered to contact a probation officer once a week by telephone. I did so for the first two months after my release.

92.   I was subjected to criminal prosecution. I received a letter on or about July 15, 2003, advising me that my hearing date was postponed. I true and correct copy of this letter is attached as Exhibit "53" to my Statement of Material Facts. [Skop SMF, Ex. 53, p. 1].

### ONGOING PROSECUTION

93.   Skop was forced to hire a criminal attorney. [Skop Dec., ¶ 68]. Her attorney sent a letter to the Solicitor General for the City of Atlanta, Joe Drolet, on August 1, 2003 advising him of the circumstances of my arrest. [Skop Dec., ¶ 68; Ex. 53, p. 2-4].

94.   Skop was required to report to a probation officer. [Skop Dec., ¶ 66].

95.   Her case remained pending with the Solicitor General's Office for over a year. [Skop Dec., ¶ 69].

96.   On September 3, 2004, Drolet sent a letter advising that "no charges will be filed against Laura Lee Skop arising out of the incident near her home on July 10, 2003. This case is considered closed in this office." [Ex. 53, p. 9].

97.   Despite that letter, the records of the Solicitor's Office still do not show a formal
      disposition of Skop's charges.  She cannot get her record expunged until that occurs.
      [Skop Dec., ¶¶ 70-71].

### MUNICIPAL LIABILITY – FAILURE TO TRAIN

98.   Major Spillane, can think of very little training offered by the City to help officers
      understand the importance of a mature, professional attitude in handling police/citizen
      encounters in non-criminal situations.  [Spillane Dep., pp. 80-81].  His best example
      is a course called "Verbal Judo," which is a training class to "train officers to use
      verbal skills to potentially prevent having to use physical means to gain somebody's
      cooperation."  [Spillane Dep., p. 81].

99.   Spillane recognizes that there is an important distinction between communicating with
      citizens at the scene of a crime as opposed to citizens in a situation such as that
      confronting Brown on July 10, 2003.

>     In dealing with people suspected of criminal activity, you're
>     more on guard.  You are more careful of your interaction with
>     the person and you're more ready to act if they do something
>     that would harm you or another person, whereas your normal,
>     everyday interactions with citizens on a community drop-in or
>     directing traffic are more geared towards helpful scenario than
>     initiating an arrest of a citizen.

[Spillane Dep., p. 82].

100. Padgett's training history shows that in the fourteen (14) years before the incident with Skop, he took one (1) two-hour class on "customer service" in 2000, a three-hour class on "traffic direction and control" in 1997 and an eight-hour "cultural awareness class" in 1993.  Otherwise, none of the training classes he took appear to have anything at all to do with police/citizen encounters in non-criminal situations. [Padgett Dep., p. 70; Ex. "69"].

101. Spillane's training history similarly demonstrates lack of adequate training on managing police/citizen encounters outside the scope of criminal investigations. Other than a miscellaneous traffic course in 1997, he has never taken a class that has anything at all to do with the type of situation that confronted Brown on July 10, 2003.  [Ex. "71"].

102. Deputy Chief Harold Donovan has been with the department since 1972.  Other than a twelve-hour interpersonal communications course in 1996,  he has never taken a class that has anything at all to do with the type of situation that confronted Brown on July 10, 2003.  [Ex. "72"].

103. Melvin Hendricks has been with the department since 1979.  Like his colleagues, he has never taken a class that has anything at all to do with the type of situation that confronted Brown on July 10, 2003.  [Ex. "73"].

104. A review of the subjects handled in recruit classes, shows that two (2) hours are spent on intersection traffic control, two (2) hours are spent on human relations and one (1) hour is spent on police ethics and courtesy.  [Ex. "74", pp. 6-9]. [Ex. "72", pp. 6-9].

105. Officer Darrell Lester has been with the department since 1987.  He has been offered one (1) three-hour class in traffic direction and control in 1997 and one (1) three-hour class in community oriented policing in 1996. [Ex. "75"].


/s/ William J. Atkins
WILLIAM J. ATKINS
State Bar No.  027060
*Counsel for Plaintiff*

**PARKS, CHESIN & WALBERT, P.C.**
75 Fourteenth Street, N.E., Suite 2600
Atlanta, Georgia 30309
Telephone:   (404) 873-8000
Facsimile:   (404) 873-8050

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **LAURA SKOP** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **FILE NO.:   1:05-CV-1754-BBM** |
| | : | |
| **CITY OF ATLANTA, GEORGIA,** | : | |
| **OFFICER TIMOTHY BROWN,** | : | |
| **in his individual capacity, &** | : | |
| **SERGEANT THOMAS L.** | : | |
| **PADGETT, in his individual** | : | |
| **capacity,** | : | |
| | : | |
| **Defendants.** | : | |

---

## CERTIFICATE OF SERVICE AND TYPE

I hereby certify that I have prepared the foregoing document:  **Plaintiff Laura Skop's**

**Statement of Material Facts to Which There Remains a Genuine Issue to Be Tried** in

*Book Antiqua – 14 point font* in accordance with Local Rule 5.1(C), and have filed the same

with the Clerk of Court using the CM/ECF system which will automatically send email

notification of such filing to the following attorneys of record:  *Dennis Young & Cleora*

*Anderson, City of Atlanta Law Department, 68 Mitchell St., SW, Suite 4100, Atlanta, Georgia*

*30335-0332.*

*– Signature on following page –*

This 15th day of June, 2006.

                                         /s/ *William J. Atkins*
                                         WILLIAM J. ATKINS
                                         State Bar No. 027060

PARKS, CHESIN & WALBERT, P.C.
26th Floor, 75 Fourteenth Street
Atlanta, Georgia 30309
Telephone: (404)873-8000
Facsimile: (404)873-8050
E-mail: batkins@pcwlawfirm.com