**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| LAURA SKOP | : |
|     Plaintiff, | : |
| v. | : CIVIL ACTION |
| | : FILE NO.: 1:05-CV-1754-BBM |
| CITY OF ATLANTA, GEORGIA, | : |
| OFFICER TIMOTHY BROWN, | : |
| in his individual capacity, & | : |
| SERGEANT THOMAS L. | : |
| PADGETT, in his individual | : |
| capacity, | : |
|     Defendants. | : |

**DECLARATION OF OF LAURA LEE SKOP**

**Laura Lee Skop**, after being duly sworn, states the following based upon her personal knowledge.

1. My name is Laura Lee Skop. I am over eighteen years of age. I suffer from no legal disabilities, and I am giving this statement based upon my own personal knowledge.

2. I am 5'6" tall. I weigh 130 pounds. I have blonde hair and a fair complexion. I have an athletic build.

3. I was born in New York City. I moved to the Atlanta area with my family over thirty (30) years ago. I graduated from Forsyth County High School in 1980.

4. I attended The Georgia Institute of Technology from 1980 to 1984. I graduated with a Bachelor of Science in Industrial Engineering.

5. I am a technology consultant. I have worked continuously in the information technology field since graduating from college in 1984. I have held a variety of different positions with consulting firms in the Atlanta area.

6. Prior to this incident, I had little or no direct involvement with law enforcement. I have never been the victim of a serious crime. I have never been charged or convicted of any crime at all, other than minor traffic violations.

7. I had always held the law enforcement community in the highest regard and had no reason to distrust law enforcement before this incident.

8. I live in a single family residence located at 1375 Middlesex Avenue in the Morningside neighborhood of Atlanta. The photographs attached as Exhibits "81," "82," and "83" to my <u>Statement of Material Facts</u> fairly and accurately depict my residence, my driveway, and the entrance to my garage, which is

located directly below the main floor of my residence.

9. I have lived in my home for twenty-one (21) years. At the time of the incident, I always parked my car in my garage. As a single woman, I feel safer pulling into my garage, waiting for my driveway gate to close, and lowering my garage door before I get out of my car.

10. My mailbox is located at the end of my driveway. The street number of my home is affixed to my mailbox in plain view. I took a photograph of the mailbox that was located at the end of my driveway on July 10, 2003. [See Skop SMF, Ex. "80"]. It fairly and accurately depicts the appearance of my mailbox on July 10, 2003.

11. There is a street sign at the corner of Middlesex Avenue and Hillpine Drive. This intersection is just three houses away from my home. I took the photograph attached as Exhibit 79 to my Statement of Material Facts. The photograph fairly and accurately depicts the street signs as they appeared on July 10, 2003.

12. I have known most of my neighbors for many years and, although we are not close friends, we have always been social and polite to one another.

13. With the assistance of my neighbors, I prepared a diagram of my street as it appeared at the time of the incident on July10, 2003. A true and correct copy of the diagram is attached as Exhibit "4" to my Statement of Material Facts.

14. Charlie Schroder is one of my neighbors. Mr. Schroder has lived at 1385 Middlesex Avenue for approximately fifteen (15) years. His residence is located two houses up the street from mine at the intersection of Hillpine Drive and Middlesex Avenue. [See Skop SMF, Ex. "4"].

15. Doug Kollme is one of my neighbors. Mr. Kollme has owned his residence at 1367 Middlesex Avenue for several years. His residence is located directly to the left of my house. Our houses are separated by my driveway. [See Skop SMF, Ex. "4"]

16. Dr. John Lloyd is one of my neighbors. Dr. Lloyd has lived at 1358 Middlesex Avenue for approximately ten years. His residence is located three houses down from mine on the opposite side of the street. [See Skop SMF, Ex. "4"].

17. The electric, cable and telephone lines in my neighborhood run along the opposite side of my street on wooden poles. The electric, cable and telephone lines that connect to my house hang over Middlesex Avenue and attach to a wooden pole that stands next to my mailbox. [See Skop SMF, Ex. "83"].

18. On July 10, 2003 at the time of the incident, the wooden pole located in my yard remained standing, with the electric, cable and telephone lines properly attached and hanging at their regular height. The wooden pole on the opposite side of the street closest to my home was also standing, with the electric, cable and telephone lines properly attached and hanging at their regular height.

19. In July of 2003, I was an independent consultant under contract with Venturi Technology Associates. I typically drove to work in my older model Porsche 911. I normally arrived at work around 8 a.m. and left around 5:30 p.m. It normally took me approximately twenty minutes to get home.

20. On July 10, 2003, I worked at Venturi in accordance with my normal schedule. In the late-afternoon, I became aware that a series of violent thunderstorms were crossing through the Atlanta area. I left the office a little early because I knew that the highway would likely be congested due to the weather.

21. As I drove home on my normal route, it was raining hard. The streets were wet. I drove down Monroe Drive through the intersection with Piedmont Road. I took a left turn on Hillpine Drive. I traveled up Hillpine Drive and turned right on Middlesex Avenue.

22. It was still raining hard when I turned on Middlesex Avenue. I immediately noticed a City of Atlanta Police patrol vehicle parked diagonally across the street by my driveway. The patrol vehicle's emergency lights were activated, but there was no officer in sight.

23. I also noticed that there was a large tree lying perpendicularly across Middlesex Avenue well beyond the patrol vehicle. The tree had stood in Dr. Lloyd's yard.

24. Since the incident, I have measured the distance from the area where the tree was located to the edge of my driveway that is closest to Dr. Lloyd's residence. The distance was approximately 110.8 feet. The distance to the far edge of my driveway was approximately 127 feet.

25. Since the incident, I went to the Google Earth website and plotted the distance from Dr. Lloyd's residence to my home. That distance was .04 miles. I also used Google Earth to find a satellite view of my neighborhood. True and correct copies of these maps are attached as part of Exhibit " 76" to my Statement of Material Facts.

26. I have reviewed the photographs attached as Exhibits "77" and "78" to my Statement of Material Facts. These photographs were taken by one of my

neighbors several days after the incident. The photographs fairly and accurately depict the fallen tree on Middlesex Avenue as it appeared on July 10, 2003.

27. As I tried to turn into my driveway on July 10, 2003, I realized that the patrol vehicle was slightly blocking the driveway. I was concerned that I would hit the rear, passenger side bumper of the patrol car if I attempted to enter my driveway. The patrol vehicle needed to pull up about a foot so that I could safely enter my driveway.

28. I put my turn signal light on to alert the officer sitting in the patrol car that I wanted to enter the driveway directly behind his vehicle.

29. I have reviewed the photographs attached as Exhibits "8" and "9" to my Statement of Material Facts. The photographs were taken by Mr. Kollme from his residence at the time of the incident. The photographs fairly and accurately depicts the circumstances confronting me after I put on my turn signal to enter my driveway.

30. The patrol vehicle did not move. I honked my horn and still got no response. I began to wonder if there was anyone inside the patrol vehicle.

31. I rolled down my passenger window. The officer then rolled down his passenger window. That is when I knew there was actually someone in the patrol vehicle.

32. I could not see the officer and could not hear whether he was saying anything to me. I said something to the effect of "I just need to get into my driveway." I was not sure whether the officer could hear me. I tried to communicate to the officer this way several times. But he did not move.

33. I was anxious to get inside my home because of the dangerous weather conditions. I did not know how else to communicate with the officer, so I decided to get out of my car to go speak with him.

34. Before I got out of my car, I turned off the engine. When I got out, I closed my car door because it was pouring rain. I approached the driver's side of the patrol vehicle. I stood there for a moment, but the officer did not acknowledge me, so I knocked on the driver's window.

35. The officer rolled down his window. Before I could say anything, he yelled at me, "can't you see there is a tree down and this is a hazardous area?" He rolled his window without giving me a chance to respond. He sounded angry.

36. I stood there for a moment, then knocked on the window again. The officer rolled down his window again and, in a louder voice, yelled at me again that there was a tree down. He rolled up his window a second time without giving me a chance to respond.

37. I was left standing in the rain. I was confused and upset. I could not understand why the officer simply refused to communicate with me.

38. I have reviewed the photograph attached as Exhibit "10" to my Statement of Material Facts. The photograph was taken by Mr. Kollme at the time of the incident. The photograph fairly and accurately depicts the scene confronting me when I was standing outside the patrol vehicle trying to communicate with the officer.

39. The photograph depicts me pointing back towards my driveway as I tried to communicate with the officer.

40. I did not know what else to do. I said, "can I get your name and badge number?"

41. The officer immediately got out of the patrol vehicle, slammed the door, and yelled, "do you realize I can arrest you for obstruction?"

42. I was in a state of disbelief. The officer stepped towards me. I stepped back away from him. I asked him, "how can you arrest me? This is my driveway. I just need you to pull up a foot." I was pointing down at my driveway as I said this.

43. The officer kept moving towards me. He was visibly angry. He was reaching for his handcuffs. I backed into Mr. Kollme's yard. I felt like I was being abducted. I asked if I could get my neighbor to witness this.

44. I turned and took a couple of steps towards Mr. Kollme's residence. Mr. Kollme was just coming outside. He had witnessed the entire scene.

45. I tried to ask Mr. Kollme for help. As I did, the officer grabbed my arm, twisted me around, handcuffed me, and pushed me into the back of his patrol vehicle.

46. Mr. Kollme tried to talk to the officer. I could not hear everything that was said. I do remember hearing Mr. Kollme ask the officer if he could get my car keys so that he could park my car and take care of my dog.

47. When the officer got back in the patrol vehicle, I was in tears. I asked him, "please don't arrest me."

48. The officer responded that I was "going to jail; that I would have to "bond out;" that he was going to "impound my car;" and that he could not believe that "I obstructed him." He was very angry and threatening. He kept saying "you obstructed me" over and over again.

49. I was afraid to respond unless he asked me a direct question. When I tried to say anything, it just seemed to make him angrier.

50. Throughout the incident, Brown never asked me where I lived. If he had asked me, I would have been able to tell him directly. Instead, my car was turned to enter my driveway, my blinker was on, I had repeatedly gestured toward my driveway, and I told him that I was trying to get into my driveway. I believe that Brown reasonably should have been able to ascertain my residence from all these circumstances.

51. It had stopped raining. The officer got out of the patrol vehicle and rolled down the windows. I heard him speaking on his cell phone to someone. He was using numbers that did not mean anything to me, but I got the impression that he was talking to someone about how to charge me. He also searched my car. He removed all my personal belongings and went through them.

52. Brown got back into the car. He asked me a series of questions as he filled out some paperwork.

53. At some point, my neighbor, Mr. Schroder, approached the patrol vehicle. I could not hear what was said between Brown and Mr. Schroder.

54. A tow truck arrived to tow my car. Brown backed the patrol car into my driveway so that the tow truck could load my car.

55. I have reviewed the photograph attached as Exhibit "11" to my Statement of Material Facts. The photograph was taken by Mr. Kollme at the time of the incident. The photograph fairly and accurately depicts the location of the officer's vehicle in my driveway as the tow truck operator removed my car.

56. After my car was towed, another officer arrived and placed a barricade in the roadway. The barricade did not impede access to my driveway.

57. I was wearing a blue cotton blouse and khaki pants. I was wet and cold from the rain when Brown placed me under arrest around 6:00 p.m. I have a large chest and, when he handcuffed me behind my back, I felt as though my breasts were exposed through my wet blouse. I was humiliated and scared.

58. Brown remained at the scene with me in the backseat of the patrol car for over an hour. Brown never offered me a towel, dry shirt, or other covering.

59. Brown took me to the Zone 2 precinct. I have reviewed the diagram attached as Exhibit "61" to my <u>Statement of Material Facts</u>. The diagram appears to accurately depict the precinct where I was taken by Officer Brown.

60. During much of the time that I was in the precinct, Brown made me sit in the lobby near the curbside entrance. My hands remained cuffed behind my back and my blouse was still soaking wet. I felt as though my breasts were on display for the male officers at the station.

61. Brown issued citations to me for Obstruction and Failure to Obey an Officer Directing Traffic. True and correct copies of these citations are attached as Exhibits "5" to my <u>Statement of Material Facts</u>.

62. During the time I was at the precinct, no one approached me to offer me anything to drink or to loosen my handcuffs.

63. After more than an hour, a female officer came to the station to transport me to the detention center. She immediately removed my handcuffs.

64. When I arrived at the detention center, I was fingerprinted and photographed during the "book in" process. An officer warned me to remain near the Intake Desk if "I knew what was good for me." The Intake area was crowded with recently arrestees. I noticed that the women were all standing close to the

Intake Desk and remained there myself.

65. I remained incarcerated in the detention center from approximately 10:00 p.m. on July 10, 2003 until 3:10 a.m. on July 11, 2003.

66. I qualified for a "recognizance bond." As a condition of my bond, I was ordered to contact a probation officer once a week by telephone. I did so for the first two months after my release.

67. I was subjected to criminal prosecution. I received a letter on or about July 15, 2003, advising me that my hearing date was postponed. I true and correct copy of this letter is attached as Exhibit "53" to my Statement of Material Facts. [Skop SMF, Ex. 53, p. 1].

68. I hired an attorney, Lee Perkins, to defend me. I paid Mr. Perkins $1,200.00 to represent me. Mr. Perkins sent a letter to the Solicitor General for the City of Atlanta Joe Drolet on August 1, 2003 advising him of the circumstances of my arrest. [Skop SMF, Ex. 53, p. 2-4].

69. Despite this letter, my case remained pending with the Solicitor General's Office for over a year. On September 3, 2004, Joseph Drolet sent my attorney a letter advising him that "no charges will be filed against Laura Lee Skop arising out of the incident near her home on July 10, 2003. This case is

considered closed in this office. A true and correct copy of this letter is attached as part of Exhibit "53" to my Statement of Material Facts. [Skop SMF, Ex. 53, p. 9].

70. In April of 2006, I attempted to have my record expunged. I went to the Records Department at Atlanta City Hall, the Solicitor General's Office and, ultimately, the City of Atlanta Police Department Identification Unit. When I went to the Solicitor General's Office, I was told that "no disposition was entered on the case." The Records and Police Departments told me that I needed a "letter of disposition" to request an expungement.

71. The formal records of the Solicitor's Office still do not show a formal disposition of my charges despite Mr. Drolet's letter.

**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed this 15 Day of June, 2006.

_____
Laura Lee Skop