# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **LAURA SKOP** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **FILE NO.: 1:05-CV-1754-BBM** |
| | : | |
| **CITY OF ATLANTA, GEORGIA,** | : | |
| **OFFICER TIMOTHY BROWN,** | : | |
| **in his individual capacity, &** | : | |
| **SERGEANT THOMAS L.** | : | |
| **PADGETT, in his individual** | : | |
| **capacity,** | : | |
| | : | |
| **Defendants.** | : | |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Laura Skop (hereinafter "Skop") hereby submits her <u>Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment</u> and supporting evidentiary materials demonstrating the existence of genuine issues of material fact relevant to every claim raised in her Complaint against all the Defendants; therefore, Defendants' Motion for Summary Judgment should be denied in its entirety.[1]

---

[1]In accordance with Local Rule 56.1(B)(2)(a) and (b), Skop has also filed her <u>Response to the City Defendants' Statement of Material Facts As To Which There Is No Dispute</u> and her <u>Statement of Material Facts to Which There Remains a Genuine Issue to Be Tried</u> contemporaneously with this pleading. Skop's supporting evidentiary materials are attached as exhibits to her <u>Statement of Material Facts</u>.

## TO PROTECT AND SERVE

This ubiquitous phrase serves as the motto for law enforcement agencies all across the country.  It is a plain, concise pronouncement of the twin functions of every law enforcement officer.  Generally young, brave and selfless, law enforcement officers protect the citizens of their community by enforcing the law, investigating criminal misconduct and apprehending dangerous criminals.   But on the same shift where an officer apprehends a murderer, he or she will also be asked to serve the citizens of their community in any number of ways that have nothing at all to do with crime.  Helping a stranded motorist fix a tire, offering directions, directing traffic when a light goes down, or assisting citizens affected by natural disasters – law enforcement officers perform these and other tasks every day in their communities.

However, the relentless march of crime in this country's modern history has encouraged politicians to "crack down" on crime by, among other methods, increasing the pressure on law enforcement agencies to do more enforcing, investigating and catching of criminals.  Those agencies, in turn, have shifted the emphasis in their training away from the dual function philosophy to a more one dimensional – "enforce and arrest" – mentality.

The City of Atlanta Police Department, has wholeheartedly accepted this fundamental departure from the traditional dual function of law enforcement.   Although the Defendant City of Atlanta [hereinafter "Atlanta"] proudly touts the "900 hours of training" received by

new recruits, a cursory look at the nature of that training leaves no doubt at all that Atlanta has utterly abandoned any effort to teach a recruit how to "serve" an ordinary citizen in a non-criminal encounter.

Officers like Timothy Brown (hereinafter "Brown") quickly learn to view everyone as a "subject," which is apparently just one step short of a convicted criminal. That should come as no surprise as officer like Brown never receive any training that might assist them in developing the ability to differentiate between circumstances where they must "serve" the citizens of their community, not "protect" them from criminal misconduct. This policy and custom of inadequate training leads inexorably to the very constitutional violations at issue in this case.

Poorly trained officers who only know how to treat people like suspected criminals do not stand a chance in emotional situations like weather related emergencies. Thrust into such novel situations, officers like Brown do not have the any idea how to handle ordinary people in search of answers to ordinary questions like, "when will the power come on?" or "can you let me into my driveway?"

With nothing else to rely on , Brown fell back on the only training he had ever received when he was called to the scene of a weather related emergency on July 10, 2003. He viewed concerns citizens like Dr. John Lloyd as "subjects" to be herded back inside their homes and, ultimately, escalated an benign situation with a homeowner trying to get into her

driveway into a utterly unwarranted arrest. As his commanding officer, Major Joseph Spillane, put it,

> My question was to the reasonableness of the entire situation, given the totality of the circumstances. My concern as the commander of Zone 2 with this was not that it was legal or illegal to have Ms. Skop park her car and walk, but whether it was reasonable to me and whether as a citizen I would want to be treated like that.

[Spillane Dep., p. 107].

Brown deserves no sympathy, to be sure. Nor does Sergeant Padgett ["Padgett"], the supervisor who abdicated his constitutional obligations to help his fellow cop shore up a bad arrest. But the City ultimately owns this unmitigated disaster. The Court should deny summary judgment to all the Defendants.

## STATEMENT OF FACTS

Laura Skop lives in a single family home at 1375 Middlesex Avenue in the Morningside neighborhood of Atlanta [Skop Dec. ¶ 8; Ex. "81" & "82"]. Skop has lived in her home for twenty-one (21) years. She is a successful technology consultant and has held a variety of different positions with consulting firms in the Atlanta area. [Skop Dec. ¶5]. Skop attended The Georgia Institute of Technology from 1980 to 1984 and graduated with a Bachelor of Science in Industrial Engineering. [Skop Dec. ¶ 4].

Prior to the July 10, 2003 events giving rise to this case, Skop had little or no direct involvement with law enforcement. She had never been the victim of a serious crime. She

had never been charged or convicted of any crime at all, other than minor traffic violations. [Skop Dec. ¶ 6]. Skop had always held the law enforcement community in the highest regard. [Skop Dec. ¶ 7].

On July 10, 2003, Skop's mailbox was located at the end of her driveway. The street number of her home was affixed to her mailbox in plain view. [Skop Dec. ¶ 10; Ex. "80"]. There was a street sign at the corner of Middlesex Avenue and Hillpine Drive. This intersection is just three houses away from Skop's home. [Skop Dec. ¶ 11; Ex. "79"]. The electric, cable and telephone lines in the neighborhood ran along the opposite side of Skop's street on wooden poles. [Skop Dec., ¶ 17]. Electric, cable and telephone lines connected to Skop's house ran over Middlesex Avenue and attached to a wooden pole that stood next to her mailbox. [Skop Dec., ¶ 17, Ex. "83"].

Several of Skop's neighbors witnessed Skop's encounter with Brown on July 10, 2003. Charlie Schroder is one of them. Mr. Schroder has lived at 1385 Middlesex Avenue for approximately fifteen (15) years. His residence is located two houses up the street from Skop's at the intersection of Hillpine Drive and Middlesex Avenue. [Skop Dec., ¶ 14; Ex. "4"]. Doug Kollme, another of Skop's neighbors, also witnessed some of the events. Mr. Kollme has owned his residence at 1367 Middlesex Avenue for several years. His residence is located directly to the left of Skop's house. Skop's driveway separates their homes. [Skop Dec., ¶ 15; Ex. "4"]. Dr. John Lloyd has lived at 1358 Middlesex Avenue for approximately

ten years. He also witnessed some of Skop's encounter with Brown. His residence is located three houses down from Skop's on the opposite side of the street. [ Skop Dec., ¶ 16; Ex. "4"].

On July 10, 2003, Skop went to work at Venturi in accordance with her normal schedule. In the late-afternoon, she learned that a series of violent thunderstorms were crossing through the Atlanta area. She left the office a little early because she knew that the highway would likely be congested due to the weather. [Skop Dec., ¶20]. As she drove home on her normal route, it was raining hard. The streets were wet. She drove down Monroe Drive through the intersection with Piedmont Road, took a left turn on Hillpine Drive, traveled up Hillpine Drive, and turned right on Middlesex Avenue. [Skop Dec., ¶ 21]. It was still raining hard when she turned on Middlesex Avenue. She immediately noticed a City of Atlanta Police patrol vehicle parked diagonally across the street just beyond her driveway. The patrol vehicle's emergency lights were activated, but there was no officer in sight. The patrol vehicle was occupied by Brown. [Ex. "3"]

A large tree that had stood in Dr. Lloyd's yard fell across Middlesex Avenue during the storm. [Ex. "59," "16"]. Dr. Lloyd surveyed the damage after the storm passed:

> The utility pole in my front yard was the only pole, which was damaged. The only power line that was significantly lower were the one in front of my house and the one across the street but one could walk under it in front of my house. The cable and phone line and addition to some limbs were low enough to block people from walking from my driveway and across the street but nowhere else.

[Ex. "59"]. Dr. Lloyd also saw a "gentleman [he] did not recognize [come] over and [move]

some of the wires in my yard before the police arrived." [Ex. "59"].   Dr. Lloyd also knew that "by the time the officer [Brown] had arrived tree cutters had already surveyed the area and it was clear which lines were electric and which were phone and cable.  The electric lines were still above everyone's heads." [Ex. "16"].

As Skop turned onto Middlesex Avenue , the wooden pole located in Skop's yard remained standing, with the electric, cable and telephone lines properly attached and hanging at their regular height.  The wooden pole on the opposite side of the street closest to Skop's residence was also standing, with the electric, cable and telephone lines properly attached and hanging at their regular height. [Skop Dec., ¶ 18].

Brown had been on routine patrol when he observed the fallen tree on Middlesex Avenue.  His unit number was 3210.   [Ex. "2," p. 1].  Brown radioed dispatch shortly after 17:25:15 and stated, "3210  26 [Arrived at call] at 700 Hillpine, there is a tree down . . . show me out over here on Winslow with 205[Officer Fernandez]."[Ex. "3"].  Brown knew that Officer Fernandez was nowhere near Hillpine and he also knew exactly where he was – the 1300 block of Middlesex Avenue.  [Ex. "3," p. 1].   Fernandez was located at a different fallen tree at 2620 Winslow Drive in Buckhead with the Fire Department officials who had also responded to that scene. [Ex. "4"; Ex. "35," p. 5].

When Brown first arrived on the scene, he interacted with several residents of Middlesex Avenue, including Dr. Lloyd.  Brown viewed these citizens as  "subjects " who

needed to leave the vicinity of the fallen tree. [Brown Dep., pp. 101-102; 103-108]. He issued those orders without making any effort to communicate with any of the citizens about what they knew. [Brown Dep., p. 103-108]. Without contacting Georgia Power or his supervisor as required by department policy, Brown elected to "close" Middlesex Avenue by blocking the street just to the South of Skop's driveway. [Brown Dep., pp. 104-105; 96-97, compare, Ex. 46, §§ 3.6.2, 3.5.2]. Brown wanted some down time to do his paperwork. [Brown Dep., pp. 110-11; 136; 145].

As Skop tried to turn into her driveway, she realized that the patrol vehicle was slightly blocking the driveway. She also noticed the fallen tree, which was lying perpendicularly across Middlesex Avenue by Dr. Lloyd's home and well beyond the patrol vehicle. [Skop Dec., ¶ 23; Ex. "77," "78"]. The distance from the area where the tree was located to the edge of Skop's driveway closest to Dr. Lloyd's residence was approximately 110.8 feet. The distance to the far edge of her driveway was approximately 127 feet. [Skop Dec., ¶ 24].

The patrol vehicle needed to pull up about a foot so that Skop could safely enter her driveway without striking the rear bumper of the patrol car. [Skop Dec., ¶ 27; Ex. "8," & "9"]. She put her turn signal on to alert the officer sitting in the patrol vehicle that she wanted to enter the driveway directly behind his vehicle. [Skop Dec, ¶ 28]. The patrol vehicle did not move, so Skop honked her horn. She still got no response. She began to

wonder if there was anyone inside the patrol vehicle. [Skop, Dec. ¶ 30]. She rolled down her passenger window. The officer then rolled down his passenger window. That is when she knew there was actually someone in the patrol vehicle. [Skop, Dec. ¶ 31].

She could not see the officer and could not hear whether he was saying anything to her. She said something to the effect of "I just need to get into my driveway." She was not sure whether the officer could hear her. She tried to communicate to the officer this way several times. But he did not move. [Skop, Dec. ¶ 32]. She was anxious to get inside her home because of the dangerous weather conditions. She did not know how else to communicate with the officer, so she decided to get out of her car to go speak with him. [Skop, Dec. ¶ 33].

Before she got out of her car, she turned off the engine. When she got out, she closed her car door because it was pouring rain. [Compare, Ex. 6; Brown Dep., p. 210; Padgett Dep., p. 69]. She approached the driver's side of the patrol vehicle. She stood there for a moment, but the officer did not acknowledge her, so she knocked on the driver's window. [Skop Dec., ¶ 34]. The officer rolled down his window.

Before Skop could say anything, he yelled, "can't you see there is a tree down and this is a hazardous area?" He rolled up his window without giving her a chance to respond. He sounded angry. [Skop Dec., ¶ 34]. She stood there for a moment, then knocked on the window again. The officer rolled down his window again and, in a louder voice, yelled again

that there was a tree down.  He rolled up his window a second time without giving her a chance to respond.  [Skop Dec., ¶ 36].

Throughout this entire encounter, Brown was not outside his vehicle actively directing traffic.  He was doing paperwork.  [Brown Dep., pp.  110-11; 136; 145].   Other than his initial encounter with the neighbors when he first arrived, he had not turned away any other vehicles and or seen anyone other than Skop. [Brown Dep., pp. 190-192; compare Ex. "54"].

Skop was standing in the rain.  She was confused and upset.  She could not understand why the officer simply refused to communicate with her.  [Skop Dec., ¶ 37; Ex.  "10"].  She said, "can I get your name and badge number?"  [Skop Dec., ¶ 40].  The officer immediately got out of the patrol vehicle, slammed the door, and yelled, "do you realize I can arrest you for obstruction?"  [Skop Dec., ¶ 41].  Skop was in a state of disbelief.  Brown stepped towards her.  She backed away from him.  She asked him, "how can you arrest me?  This is my driveway.  I just need you to pull up a foot."  She was pointing down at her driveway.  [Skop Dec., ¶ 41].  Brown kept advancing towards Skop.   He was visibly angry.   He was reaching for his handcuffs.  [Skop Dec., ¶ 43].  Skop backed into Mr. Kollme's yard.  She felt like she was being abducted.  She asked if she could get her neighbor to witness her arrest.  [Skop Dec., ¶ 43].

As she turned and took a couple of steps towards Mr. Kollme's residence,   Mr. Kollme was just coming outside.  He had witnessed the entire scene. [Ex. "58"].  Brown's

demeanor appeared "inflexible" to Mr. Kolme. [Ex. "58"].  Brown grabbed Skop's arm, twisted her around, handcuffed her, and pushed her into the back of his patrol vehicle. [Skop Dec., ¶ 45; Ex. "58", p. 2 ("I saw him grab her arm . . . in my front yard.")).  Mr. Kollme tried to talk to Brown.  Skop could not hear everything that was said, but she does remember Kollme ask the officer if he could get her car keys so that he could park her car and take care of her dog. [Skop Dec., ¶ 46].

When Brown got back in the patrol vehicle, Skop was in tears.  She asked him, "please don't arrest me." [Skop Dec., ¶ 47].  Brown responded that,  "[Skop going to jail; that [she] would have to "bond out;" that he was going to "impound her car;" and that he could not believe that "[she] obstructed him."  He was very angry and threatening.  He kept saying "you obstructed me" over and over again. [Skop Dec., ¶ 48].  Skop was afraid to respond unless Brown asked her a direct question.  When she tried to say anything, it just seemed to make him angrier. [Skop Dec., ¶ 48].        Throughout the incident, Brown never asked Skop where she lived.   [Skop Dec., ¶ 50].  But by the time he arrested her, Brown knew where she lived. [Brown Dep., p. 98].   Skop would have told Brown directly, if he had bothered to ask.  Her car was turned to enter her driveway, her blinker was on, she had repeatedly gestured toward her driveway, and she told him that she was trying to get into her driveway. [Skop Dec., ¶ 50].

While Skop remained in the back of his patrol car with her hands cuffed behind her back, Brown, standing outside the vehicle, spoke to Padgett on his cell phone. He told Padgett about the situation and that he had arrested Skop for obstruction. Padgett suggested that Brown should charge Skop with Failing to Obey an Officer Directing Traffic. Padgett readily assented to Brown's request that he be permitted to impound Skop's car. [Brown Dep., p. 202; 210-213; Padgett Dep., p. 71]. When Brown filled out the citations, he first completed a citation for Failure to Obey an Officer Directing Traffic, then Obstruction. [Ex. "5"]. Padgett realized that Brown had acted without probable cause in arresting Skop for obstruction, so he helped cover up Brown's mistake by recommending that he first charge her with Failure to Obey an Officer Directing Traffic. [Brown Dep., p. 202; 210-213; Padgett Dep., p. 71; Ex. "5" ].

Padgett discussed the arrest with Brown at the station. Padgett told Brown that, "legally [you] may have been right, but did [you] have to do it?" [Padgett Dep., p. 148]. Padgett had an affirmative duty as Brown's supervisor to ensure that the arrest was lawful. [Padgett Dep., p. 175-176]. Padgett had the authority to order Skop's release. [Padgett Dep., p. , Padgett had reason to be concerned about the arrest, especially after Brown told him that he was afraid that he might get sued. [Padgett Dep., p. 175-76]. Yet Padgett failed to intervene to liberate Skop. Instead, he helped Brown prepare his Incident Report and cover up Skop's illegal arrest. [Padgett Dep., p. 95-96]. Even though Brown could have released

Skop at the scene, he elected to keep her in custody because he was afraid that he or the

department might get sued. He kept her under arrest because he had "already put [his] hands

on her." [Brown Dep., p. 216-217]. Skop remained in custody from approximately 6:00 p.m.

on July 10, 2003 until 3:10 a.m. on July 11, 2003. [Skop Dec., ¶¶ 57; 65].

Skop was forced to hire a criminal attorney. [Skop Dec., ¶ 68]. Her attorney sent a

letter to the Solicitor General for the City of Atlanta, Joe Drolet, on August 1, 2003 advising

him of the circumstances of my arrest. [Skop Dec., ¶ 68; Ex. 53, p. 2-4].

Skop was required to report to a probation officer. [Skop Dec., ¶ 66]. Her case remained

pending with the Solicitor General's Office for over a year. [Skop Dec., ¶ 69]. On

September 3, 2004, Drolet sent a letter advising that "no charges will be filed against Laura

Lee Skop arising out of the incident near her home on July 10, 2003. This case is considered

closed in this office." [Ex. 53, p. 9]. Despite that letter, the records of the Solicitor's Office

still do not show a formal disposition of Skop's charges. She cannot get her record expunged

until that occurs. [Skop Dec., ¶¶ 70-71].

## ARGUMENT & CITATION OF AUTHORITIES

Skop sued the City of Atlanta ["Atlanta"], Officer Timothy Brown ["Brown"], and

Sergeant Thomas L. Padgett ["Padgett"] for false arrest and malicious prosecution in

violation of her constitutionally protected rights under the 4th and 14th Amendments to the

United States Constitution. [Doc. # 1, ¶¶ 49-59; 60-72]. Skop further alleged pendent state

law claims of false arrest and malicious prosecution against Brown and Padgett. [Doc. # 1, ¶¶ 73-75; 76-77].[2] The Defendants have now moved for summary judgment on all of Skop's claims against all the Defendants.

## I.    THE SUMMARY JUDGMENT STANDARD

In modern Federal trial practice, defendants rarely forgo their right to move for summary judgment, particularly in police misconduct cases. No matter how powerful the plaintiff's evidence, or how disputed the material facts, defendants invariably take a crack at getting the case dismissed without a trial. *See e.g. Valdes v. Crosby et al,* — F.3d — , (11th Cir., May 31, 2006)(affirming denial of summary judgment where the evidence "taken together" was "more than adequate to entitle [the plaintiff] to proceed to trail" in egregious case of sanctioned brutality against inmates); *David v. Williams et al*, — F3d –, 2006 WL 1541458 (11th Cir., June 7, 2006)(reversing grant of summary judgment to defendant officers where the facts viewed in the plaintiff's favor "cannot support a finding of even arguable probably cause for either obstruction of justice or disorderly conduct.").

This tactic creates unnecessary delay in the prompt resolution of civil rights cases, increases the expense of litigation for all parties, and quite often forces both the district court

---

[2]Skop elects to abandon her State law claims. While sufficient proof of malice certainly exists in the record to create an issue of fact as to the individual defendants entitlement to state-law immunity, the claims do not add economic value to the case and should not therefore delay resolution of this Motion.

and the court of appeals to review the entire record twice : first at summary judgment and again following a jury trial. *See e.g.* [Insert Cite of Cases on Interlocutory Appeal & Post Jury Trial]. There appears to be no downside for defendants who engage in such tactics despite the palpable irony inherent in such misuse of the summary judgment process. Summary judgment [is] an integral part of the Federal Rules as a whole, which are designed to secure the *just, speedy and inexpensive* determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548 (1986)(emphasis added). The instant Motion stands as a paradigmatic example of the rampant misuse of the summary judgment process by defendants in civil rights cases.

As a matter of law, summary judgment is only appropriate when there is "no *genuine* issue as to any *material* fact. " Fed. R. Civ. P. 56(c) (emphasis added). A *genuine* issue of material fact exists "**if the evidence is such that a reasonable jury could return a verdict for the non-moving party**." *Anderson et al v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). Materiality, in turn, is nothing more than "**a criterion for categorizing factual disputes in their relation to the legal elements of the claim and <u>not</u> a criterion for evaluating the evidentiary underpinnings of those disputes**." *Id.* (emphasis added).

At the summary judgment stage, "the judges's function is not himself to weigh the evidence and determine the truth of the matter; but to determine whether . . . the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law." *Id.* at 250-251.

> Credibility determinations, the weighing of the evidence and the drawing of
> legitimate inferences from the facts are jury functions, not those of a judge,
> whether he is ruling on a motion for summary judgment or directed verdict.
> The evidence of the non-movant is to be believed, and all justifiable inferences
> are to be drawn in his favor.

*Id.* at 255. Further, the Court must consider "the entire record, [and] '**disregard all**

**evidence favorable** to the moving party that the jury is not required to believe.'" *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2110-2102 (2000)

(emphasis added). The non-movant is not required to "produce evidence in a form that

would be admissible at trial in order to avoid summary judgment."[3] *Celotex*, 477 U.S. at 324.

Contrary to the fanciful assumptions of so many civil rights defendants, the Supreme

Court plainly never intended that such a conservative evidentiary framework for evaluating

summary judgment motions would be used to "flush" a disproportionate number of civil

rights cases from the federal system. "Neither do we suggest that the trial courts should act

other than with caution in granting summary judgment or that the trial court may not deny

summary judgment in a case where there is reason to believe that the better course would be

to proceed to a full trial." *Anderson,* 477 U.S. at 255. That clear admonition has long since

---

[3]Obviously, Rule 56 does not require the nonmoving party to depose her own
witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any
of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings
themselves . . . *Id.*

been forgotten by too many defense attorneys, their clients and, on occasion, the district courts themselves.

Properly and fairly applied in police misconduct cases, summary judgment should rarely serve to insulate defendant law enforcement officers from the cautious scrutiny of a fair-minded jury. The principles at stake in cases such as this involving a substantial deprivation of liberty of an ordinary citizen trying to do nothing more than pull into her driveway spring from the constitutional foundations of our Nation. One would be hard pressed to identify a greater threat to liberty for the framers of the Constitution than "the exercise of arbitrary authority by the Government . . ." *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807 (1994).

## II. THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

### A. THE QUALIFIED IMMUNITY STANDARD

Qualified immunity is, as the term implies, qualified. It is not absolute. . . . The principles behind qualified immunity would be rendered meaningless if such immunity could be invoked to shelter officers who, because of their own interests, allegedly flout the law, abuse their authority, and deliberately imperil those they are employed to serve and protect.

*Kingsland v. City of Miami et al*, 382 F.3d 1220, 1234 (11th Cir. 2004). Officers like the individual defendants simply do not deserve the right to hide, even for a moment, behind a defense formulated to "balance the need for a remedy to protect citizens' rights and the nee for government officials to perform their duties without the fear of constant, **baseless**

litigation." *Id.* at 1232, *citing GJR Inv., Inc. V. County of Esscambia,* 132 F.3d 1359, 1366 (11th Cir. 1998). There is nothing at all baseless about Skop's claims; instead, it is hard to imagine a more obvious instance of a patently illegal arrest and prosecution of an innocent citizen.

In cases where qualified immunity is a viable affirmative defense, the public official sued in his individual capacity must initially prove that "he was acting within his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). If the public official meets this initial burden, the burden shifts to the plaintiff to overcome the defense. The Supreme Court has adopted a two-part, sequential analysis for evaluating a qualified immunity defense. *See Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151 (2001). The "threshold inquiry" is whether the plaintiff's allegations, construed most favorably to the plaintiff, state a constitutional violation. This inquiry is an "objective" one, so the public official's subjective state of mind is not relevant. If the plaintiff's evidence adequately states a constitutional violation, the court next considers whether that right was "clearly established." *Id., see also*, *Davis v. Williams*, — F.3d — , 2006 WL 1541458 (!1th Cir., June 7, 2006).

As to the second inquiry, Skop must observe that the Defendants ask the Court to apply the very same "narrow view" of clearly established law soundly rejected by the Supreme Court in *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508 (2002). In *Hope*, the

Court "chastised [the Eleventh Circuit] for taking an unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations." *Holloman ex rel Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004)*, <u>*citing*</u> *Hope, at 739*. The Court should decline the Defendants' invitation down this narrow path; instead, the Court should apply the more flexible approach that has since been adopted by the Eleventh Circuit. <u>Id</u>. at 1278.

> While officials must have fair warning that their acts are unconstitutional, there need not be a case on all fours, with materially identical facts, before we will allow suits against them. A principle of constitutional law can be clearly established even if there are notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights.

<u>Id</u>. at 1277.). Unlike the overly stringent standards of old, *Hope* stands for the simple proposition that, "officials can still be on notice that their conduct violates established law **even in novel factual circumstances**." *Hope*, p. 741 (emphasis added).

In the context of the Fourth Amendment, the Eleventh Circuit now recognizes three distinct sources of clearly established law that may give fair warning to public officials. *Vinyard v. Wilson*, *311 F.3d 1340, 1349-1355 (11th Cir. 2002)*. In cases of "obvious clarity," the "words of the pertinent federal statute or constitutional provision . . . will be specific enough to [clearly establish the applicable law] and to overcome qualified immunity, even in the total absence of case law." *Id. at 1350*. In "broad principles" cases, "a general

constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Id. at 1351 (internal punctuation omitted).* Finally, in certain cases the alleged constitutional violation will been found to be unconstitutional in the prior decisional law under "materially similar facts;" that is, facts that are not "distinguishable in a fair way." *Id. at 1351; see also, Saucier, 533 U.S. at 202.*

The unconstitutionality of the conduct alleged herein against the individual officers was clearly established in each and every way recognized by the Eleventh Circuit in *Vinyard* and its progeny. The plain language of the Fourth Amendment, the broad principles of law announced in prior Fourth Amendment decisions in the Eleventh Circuit, and the prior decisional law of this Circuit together announced with crystal clarity that Skop's arrest without probable cause and subsequent prosecution violated her constitutional rights.

### B.    FALSE ARREST

"A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim." *Marx v. Gumbinner*, 905 F.2d 1503, 1505 (11th Cir. 1990). "Probable cause to arrest exists when an arrest is objectively reasonable based on the totality of the circumstances." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998).

> This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

*Id., quoting Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995).[4]  The Eleventh Circuit

recently adopted the reasoning of the Fourth Circuit in *Sevigny v. Dicksey*, 846 F.2d 953 (4th

Cir. 1988), and further refined the probable cause standard.

> [T]he officer [is charged] with possession of all the information reasonably
> discoverable by an officer acting reasonably under the circumstances . . . A
> police officer may not close his or her eyes to facts that would help clarify the
> circumstances of an arrest.

*Kingsland*, 382 F.3d at 1229.

As the individual defendants concede that the evidence cannot support, as a matter of

law, an outright finding of probable cause in this case, the Court must instead consider

whether the individual defendants had "arguable probable cause" to justify their actions.

> [The Court] must inquire whether reasonable officers in the same
> circumstances and possession the same knowledge as the Defendants could
> have believed that probable cause existed to arrest the Plaintiff.

*Kingsland*, *supra*, at p. 1232.  There is no evidence supporting the remotest inference of

arguable probable cause in this case, therefore, the individual defendants are not entitled to

---

[4]In a recent decision, the Eleventh Circuit looked to Florida state law to determine whether "arguable probable cause" existed to justify an arrest for "obstruction." *Davis v. Williams*, — F.3d — , 2006 WL 1541458 (!1th Cir., June 7, 2006).  Accordingly, Skop directs the Court to a recent decision of the Georgia Court of Appeals where the court ruled that, "[f]or speech to rise the level of [misdemeanor] obstruction, it must be reasonably interpreted to be a threat of violence to the officer, which would amount to an obstruction or hindrance." *Woodard v. Gray et al*, 241 Ga. App. 847, 850, 527 S.E.2d 595 (2000).  Skop's conduct in asking Brown to let her into her driveway plainly did not rise to the level of misdemeanor obstruction or any other crime under Georgia law.

qualified immunity.

Viewed in the light most favorable to Skop, the evidence shows that Skop's residence, including her driveway, were well outside the area of immediate danger – if there was such an area. Brown's own intransigence upon his arrival prevented him from learning that the power lines remained in the air and did not pose a threat to anyone. When Skop arrived on the scene, she simply tried to get Brown to pull up a "foot or so" so that she could enter her driveway. She did nothing more than try repeatedly to communicate that eminently reasonable request to Brown. She never cursed, yelled or threatened Brown. When she asked for his badge number, Brown arrested her for "obstruction." "

At the time, Brown was not actively directing traffic; he was sitting in his car doing paper work. Brown had not communicated with any other persons after his initial encounter with the neighbors, nor had he turned any other vehicles away. In other words, Skop did not interfere with Brown's "efforts," such that they were, to "direct traffic," she interrupted his paperwork.[5] Even Brown admits that the only basis for his arrest was that Skop did not follow his ridiculous command to park her car and walk to her home in the middle of a torrential downpour.

---

[5]As Brown was not actively doing anything other than paperwork, and his order to Skop – "park and walk"– was completely arbitrary, the Court could well determine that Brown has not carried his burden of proving that he was acting within his discretionary authority. *See e.g. Holloman, supra*, at 1266-67.

As every senior officer deposed in this case admitted, no objectively reasonable officer confronting those circumstances would have believed that probable cause existed for arresting Skop.  Furthermore, Brown's actions were utterly unreasonable from the moment he arrived at the scene and contributed directly to his inane decision to arrest an ordinary citizen trying to get inside her house.  An objectively reasonable officer would have made an effort to communicate with the neighbors about the power lines; would have gotten out of his car to speak with Skop; would have ascertained where she was trying to go and, upon learning that where she lived, pulled up a foot to let her in her driveway.  Brown cannot now attempt to escape liability because he elected to conduct himself in a self-righteous, abusive and unprofessional manner.

Brown now claims that he was operating under a "good faith, but mistaken belief" as to his location that somehow excuses his decisions.  He contends that he simply did not know where Skop lived and did not realize that she was trying to get into the driveway directly behind his patrol vehicle.   Of course, Brown never bothered to ask Skop where she lived before arresting her.  "A police officer may not close his or her eyes to facts that would help clarify the circumstances of an arrest." *Kingsland*, 382 F.3d at 1229.   But even assuming that he had no such duty, the circumstances confronting Brown, viewed in Skop's favor, left no doubt at all as to where Skop was trying to go.

The Eleventh Circuit recently reversed the grant of summary judgment to defendant

police officers under similar circumstances.  *See Davis v. Williams*, — F.3d — , 2006 WL

1541458 (!1th Cir., June 7, 2006).  In *Davis*, the plaintiff was hosting a family get together

at his home when he saw police lights in the roadway beyond his driveway.  The defendant

officers were conducting a traffic stop.  The plaintiff was concerned because the police car

was blocking the roadway, forcing oncoming cars to drive onto another part of his property

which ended in an unlit lake.  When he tried to communicate this information to the officers,

one of them stated, "Leave now or I'll arrest you."  The Plaintiff asked if he could speak to

the officer's superior and, within a few seconds, found himself under arrest.   The  Eleventh

Circuit held that,

> Neither an owner's simple inquiry as to why officers are present on his
> property nor a person's attempt to bring a dangerous situation to the officer's
> attention can be construed as obstruction of justice or disorderly conduct.  Nor
> can a citizen be precluded by the threat of arrest from asking to speak to an
> officer's superior or from asking for an officer's badge number.   Those
> inquires likewise do not constitute obstruction of justice.

*Id.  Davis* does not break any new legal ground; the Eleventh Circuit has previously denied

qualified immunity to officers in circumstances similar to those at issue in this case.  *See e.g.*

*Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998)(denying qualified immunity to officer

called to resolve a payment dispute at a motel); *Thornton v. City of Macon*, 132 F.3d 1395,

1399 (11th Cir. 1998)(no arguable probable cause where plaintiff had committed no crime and

had not threatened anyone; he simply refused to cooperate with the officers' efforts to resolve

a civil dispute).

Furthermore, the Eleventh Circuit holds officers responsible for ascertaining facts readily available to them at the time of an arrest. *Kingsland*, 382 F.3d at 1229. That is precisely why the Defendants' reliance on *Post v. City of Fort Lauderdale*, 7 F.3d 1552 (11th Cir. 1993) is hopelessly misplaced. *Post* involved agents who made an honest mistake: while inspecting a restaurant for a building control violation, they mistakenly counted employees as patrons and fined the establishment for being over its maximum capacity. *Id.* at 1558. Brown made no such "reasonable" mistake here, he simply elected to "close his eyes" to the facts by refusing to listen to Skop as she made her simple plea: "please let me in my driveway."

Padgett fares no better than Brown under the pre-existing law of this Circuit governing supervisory liability in § 1983 claims. Padgett may be held liable if "he directed officers under his control to commit a constitutional violation" or failed to intervene" when an officer commits such a violation in his presence. *See e.g. McKinney v. DeKalb County*, 997 F.2d 1440, 1443 (11th Cir. 1993); *Skrtich v. Thornton*, 280 F.3d 1295 (11th Cir. 2002). In this case, the evidence viewed in Skop's favor establishes Padgett's liability under either theory.

Brown called Padgett immediately after arresting Skop. Padgett recognized that Brown's arrest of Skop made no sense under the circumstances confronting Brown. Although he had the absolute authority to order Skop's immediate release, Padgett instead

"suggested" that Brown "add on" a different charge – Failure to Obey an Officer Directing Traffic. Padgett also acquiesced in Brown's punitive request to impound Skop's car, even though Padgett knew that Skop's car was pulled up directly outside her house. Later still, when Brown returned to the precinct with Skop in his custody, Padgett learned that Brown remained uncertain about his decision to arrest Skop. He also learned that Brown was afraid of civil liability. Even though he had an absolute duty to investigate whether any probable cause actually existed to arrest Skop, Padgett never interviewed Skop – who was sitting in the precinct. Instead, he decided to protect Brown and helped him craft an Incident Report that might stand up in Court.

This evidence, viewed in Skop's favor, creates material issues of fact as to whether Padgett elected to participate in Brown's illegal arrest of Skop rather than do his constitutional duty by intervening to protect Skop from Brown's illegal actions. There is no doubt that Padgett was in a "position to intervene" throughout the events of July 10, 2003. *See Ensely v. Soper*, 142 F.3d 1402 (11th Cir. 1998). Padgett simply chose not to do so and, accordingly should not be entitled to qualified immunity.

*McCray v. Dothan et al*, 2003 WL 23518420 (11th Cir. 2003)(unreported opinion), also involved claims of supervisory liability in a false arrest case arising out of dispute in a restaurant. The Eleventh Circuit affirmed summary judgment on qualified immunity grounds for one supervisor and reversed summary judgment for two other supervisory

officers. As to the first supervisor, the Court explained that the supervisor impressions of the plaintiff's behavior were "entirely dependent on the information relayed by [the other officers's], thus the supervisor had "not participated or authorized a violation" of the plaintiff's rights. *Id.* As to the two other officers, the Court noted disputed issues of fact as to whether the officers witnessed the altercation between a fellow officer and the plaintiff and thus "would have been obligated not only to refrain from using force themselves, but to assist [the plaintiff] in the face of [their fellow officer's] unlawful force." *Id., see also,* *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985).

Padgett's actions are far closer to those of the two officers at the scene in *McCray* than those of the supervisor. While Padgett was admittedly not present, he acknowledges his immediate surprise upon hearing of Skop's arrest. He might well have been able to reasonably rely on Brown's version of events, except that Brown himself was uncertain as to whether the arrest was justified, what the charges should be, and whether he risked civil liability by releasing Skop. When Brown then arrived at the station with Skop, Padgett abdicated his absolute duty to ensure that Brown's arrest was valid by failing to interview Skop or press Brown for more details of Skop's purported misconduct. He instead elected to participate in Brown's unconstitutional seizure by helping shore Brown's Incident Report. Padgett is simply not entitled to qualified immunity under these facts.

As the evidence viewed in Skop's favor establishes a constitutional violation against both individual defendants, the Court must insure that the right at stake was "clearly established." For the last sixteen years, the Eleventh Circuit has recognized that "[i]t is clearly established that an arrest without probable cause violates the Fourth Amendment." *Von Stein v. Bresher*, 904 F.2d 572, 578 (11th Cir. 1990). That is an obvious constitutional principle embedded in the language of the Fourth Amendment. False arrest cases are thus routinely considered cases of "obvious clarity" or as cases governed by "broad principles" announced in prior decisional law. *See Vinyard, supra; Thornton v. City of Macon et al*, 132 F.d at l399; *Sheth v. Webster*, 145 F.3d at 1238; *Kingsland*, 382 F.3d at 1229; *Davis, supra*. Much to the Defendant's chagrin the law just does not require a "case on all fours" anymore in any legal context and, in the context of the Fourth Amendment, no such requirement has ever existed. Brown and Padgett are not entitled to qualified immunity on Skop's false arrest claims.

### C.   MALICIOUS PROSECUTION

The Eleventh Circuit recognizes malicious prosecution as a cognizable claim under the Fourth Amendment. *See e.g. Kelly v. Curtis et al*, 21 F.3d 1544 (11th Cir. 1994)(false arrest, malicious prosecution, and illegal detention all . . . are cognizable claims under 42 U.S.C. § 1983); *Whiting v. Traylor et al,* 85 F.3d 581 (11th Cir. 1996)(same)*; Uboh v. Reno,* 141 F.3d 1000, 1002-1004 (11th Cir. 1998)(same) *Wood v. Kesler,* 323 F.3d 872 (11th Cir.

2003)(same); *Kingsland v. City of Miami et al,* 382 F.3d 1220 (11ᵗʰ Cir. 2004)(same). The claim "arises by way of analogy to the common law tort of malicious prosecution," so courts look "to the common law for guidance as to the constituent elements of the claim." *Uboh,* 141 F.3d at 1004.

Georgia's appellate courts recognize six elements in a malicious prosecution claim: (1) a criminal prosecution; (2) instigated without probable cause; (3) with malice; (4)pursuant to a valid warrant, accusation, or summons; (5) that terminated in plaintiff's favor; and (6) caused the plaintiff damage. *See e.g. Gibbs v. Loomis, Fargo & Company et al,* 259 Ga. App. 170, 173-74, 576 S.E.2d 589 (2003); *see also,* O.C.G.A. § 51-7-40. The Eleventh Circuit applies these elements when it evaluates a federal malicious prosecution claim arising in Georgia. *Uboh,* 141 F.3d at 1004.

The Defendants do not challenge that Skop has produced material facts supporting the first, fourth, fifth, and sixth elements of malicious prosecution. The only elements challenged by the individual defendants are whether probable cause existed and whether evidence of malice exists.[6] Summary judgment is particularly inappropriate where disputed issues of material fact exist regarding these elements of a malicious prosecution claim. "It is well settled that in an action to recover damages for malicious prosecution where, as here,

_____

[6]As to probable cause, it bears repeating that the individual defendants don not contend that the evidence supports an *actual* probable cause determination, but only *arguable* probable cause.

the evidence is in dispute, the existence or non-existence of malice and want of probable cause are questions of fact for the jury." *Good Holding Co. v. Boswell, 173 F.2d 395, 399 (5th Cir. 1949); cited in Kingsland, 382 F.3d at 1235*. There should be no doubt at all that such is the case here and, as pre-existing law put the individual defendants on notice that they were violating Skop's constitutional rights, summary judgment should be denied.

There is no need to rehash the evidence establishing a complete lack of probable cause to support Skop's initial detention. Instead, Skop directs the Court's attention to the two facts arising from that detention that establish sufficient proof of malice on the part of the individual defendants to warrant a jury trial. As Major Spillane admitted, Brown and Padgett decision to impound Skop's car when it was directly in front of her home and a neighbor was prepared to park it in her driveway was just "punitive." No justification at all, other than a vindictive desire to maximize the humiliation, expense and inconvenience of the arrest could possibly justify their actions. Brown claimed that Skop "abandoned" her car in the middle of the road with the door open and the engine running.

Skop flatly contradicts Brown's self-serving testimony. She testified that she turned off her car and closed the door when she stepped out to speak with Brown. After all, it was pouring rain and she saw no reason to soak the interior of her sports car. The photographic evidence likewise contradicts Brown's claim that Skop's car was left "in the middle of the road." As her neighbor, Doug Kollme, recalled, "her care was on the left side because she

was basically angling to get into the driveway." [Ex. "58"]. When Kollme offered to "move her car to the curb which was 5 feet away, . . . he wouldn't let me do that." [Ex. "58"]. As Spillane observed, department policy permitted Brown to release the vehicle to Kollme with Skop's permission. But Brown, with Padgett's acquiesce, was only interested in punishing Skop for daring to ask him to move his patrol car.

Second, Brown and Padgett had every opportunity to end Skop's detention at any number of times over before she was transported to the Detention Center at approximately 10:00 p.m. Officers routinely allow persons charged with misdemeanor violations to go free with a citation requiring them to appear in court at a later date. Brown had that discretion pursuant to City policy and Padgett most certainly had that authority as Brown's supervisor. But Brown and Padgett were not worried about minimizing the intrusion on Skop; they were far more concerned with their own risk of civil liability. Brown admitted that he affirmatively chose to keep Skop in custody after the initial arrest because "I had already placed my hands on her." [Brown Dep., p. 215].

> Q:   Are you trained, sir, that once you put your hands on someone, you can't release them from your custody?
> A:   I can release them.
> Q:   So you had that discretion?
> A:   I can; but in the manner that this took place, I knew that I wouldn't have the – the discretion to do so. I knew that it was the best to – *it was in the best interest to actually take her into custody*.
> Q:   Well, now whose best interests were served by taking her into custody, Officer Brown?

A. It would have – ***It would have been myself***.
Q: Right. 'Cause if you had arrested her and then released her you were afraid you were going to get sued –
A: ***Absolutely***.
[ . . . ]
Q: Well, whose interests were you looking out for then?
A: ***The departments***.
Q: How so?
A: ***For liability reasons***.

[Brown Dep., pp. 215-217]. Padgett knew of Brown's concerns at the time of the arrest or, at the latest, when Brown arrived at the station. He did not follow up on those concerns to ensure that probable cause existed; he elected to participate in Brown's efforts to continue a baseless prosecution to protect the department from civil liability.

As the evidence sufficiently establishes a constitutional violation, the Court must again ensure that Skop's right not to be subjected to a baseless and malicious prosecution was clearly established. As with false arrest claims, the Eleventh Circuit has repeatedly held that such a right is firmly embedded in the language of the Fourth Amendment and, accordingly, the broad principles announced by the Court have firmly established the law in this Circuit. *See e.g. Kelly v. Curtis et al, 21 F.3d 1544 (11ᵗʰ Cir. 1994)(false arrest, malicious prosecution, and illegal detention all . . . are cognizable claims under 42 U.S.C. § 1983); Whiting v. Taylor et al, 85 F.3d 581 (11ᵗʰ Cir. 1996)(same); Uboh v. Reno, 141 F.3d 1000, 1002-1004 (11ᵗʰ Cir. 1998)(our Court . . . unequivocally has identified malicious prosecution to be a constitutional tort under § 1983) Wood v. Kesler, 323 F.3d 872 (11ᵗʰ Cir.*

*2003)(same)*.  The broad principles announced in these and other cases decided prior to the events of July 10, 2003, gave the individual defendants fair warning that their conduct violated clearly established law.[7]

### III. MUNICIPAL LIABILITY:  THE CITY OF ATLANTA IS LIABLE FOR SKOP'S INJURIES

Initially, Skop contends that the Defendants have failed to carry their burden at the summary judgment stage.

> A party seeking summary judgment always bears the initial responsibility of . . . identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  In this District, the Defendants were required pursuant to Local Rule 56.1 to:  "include with the motion and brief a separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried."  While the Defendants prepared such a document, none of the separately numbered "material facts" are, in fact, material to Skop's theory of municipal liability; that is, that the City of Atlanta failed to adequately train its

---

[7]Skop notes that the Defendants limited their challenge to the malicious prosecution claim to the issues of probable cause and malice.  Skop thus only addresses these issues in her Brief.  Should the Court elect to consider, sua sponte, whether Skop has properly alleged a "seizure" pursuant to "legal process," Skop respectfully requests that she be permitted to brief that matter to the Court. *See e.g., Whiting v. Traylor*, 85 F.3d 581, 583-586 (11th Cir. 1996)(Arrest on warrant; overnight detention; release on bond; formal charge and arraignment sufficient to establish a "seizure" for Fourth Amendment purposes).

officers to properly handle police-citizen encounters in non-criminal circumstances. Instead, the Defendants cite to several conclusory "facts" in their brief that purport to prove the City's entitlement to summary judgment. Under Local Rule 56.1(B)(1), however, "the Court will not consider any fact . . . set out only in the brief and not in the movant's statement of undisputed fact." Accordingly, the Court should deny summary judgment to the City of Atlanta as it has failed to carry its initial burden at the summary judgment stage in accordance with the Local Rules.

Should the Court nevertheless consider the City's motion, the evidence produced by Skop in support of her theory of municipal liability creates an issue of fact as to whether the City's custom of failing to properly train its officers was "the moving force" that lead to Skop's illegal arrest, detention and prosecution. *Monell et al v. Department of Social Services of New York*, 436 U.S. 658, 98 S. Ct. 2018 (1978). Skop contends that the City has essentially abandoned any effort to train its officers on "serving" the citizens of their community outside the criminal investigation, apprehension and prosecution context. In support of her contention, she points to the training records of the officers involved in this matter, as well as the recollections of some of the City's more senior officers. This evidence shows a long standing custom of focusing all training in the department on the "protection" half of the law enforcement creed.

Major Spillane, for example, can think of very little training offered by the City to

help officers understand the importance of a mature, professional attitude in handling police/citizen encounters in non-criminal situations. [Spillane Dep., pp. 80-81]. At the same time, Spillane recognized the important distinction between communicating with citizens at the scene of a crime as opposed to citizens in a situation such as that confronting Brown on July 10, 2003.

> In dealing with people suspected of criminal activity, you're more on guard. You are more careful of your interaction with the person and you're more ready to act if they do something that would harm you or another person, whereas your normal, everyday interactions with citizens on a community drop-in or directing traffic are more geared towards helpful scenario than initiating an arrest of a citizen.

[Spillane Dep., p. 82].

Yet, the training histories of the officers involved demonstrate that the City offers no training at all to help officers deal with non-criminal interactions with citizens. [See e.g., Padgett Dep., p. 70; Ex. "69"; Ex. "71"; Ex. "72"; Ex. "73"; Ex. "75"; Brown Dep., pp. 152-153; Ex. "67"]. Brown's training history reflects this very same deficiency. [Ex. "42"]. Brown admitted that he never received any training on how to "direct traffic around a hazardous area" or interact with citizens under such circumstances. [Brown Dep., pp. 153-154].

A review of the subjects handled in recruit classes, shows that two (2) hours are spent on intersection traffic control, two (2) hours are spent on human relations and one (1) hour

is spent on police ethics and courtesy. [Ex. "74", pp. 6-9]. [Ex. "72", pp. 6-9]. Further, the materials provided to new recruits like Brown by the Police Academy during the basic mandate training on traffic direction and control have nothing at all to do with directing traffic during a weather related emergencies. [Ex. "67"]. None of the roll call training issues considered by officers in Zone 2 had anything at all to do with handling weather related emergencies or police/citizen encounters in non-criminal situations, such as those facing Brown on July 10, 2003. [Ex. "68"].

The evidence further establishes that this utter failure to train Brown, or his fellow officers, led directly to the Fourth Amendment violations at issue. Untrained, Brown simply reverted to the only training and experience he had – crime fighting. He treated Skop's neighbors as "subjects" to be cleared from a hazardous area, not citizens concerned for their homes. He treated Skop no better by issuing a senseless order without so much as asking her where she was trying to go. The totality of the circumstances of Skop's arrest demonstrate that Brown was ill equipped to deal with those circumstances. Various senior officers testified to a litany of things that Brown simply failed to do apparently out of ignorance and inexperience. Such evidence should be sufficient – in light of the City's failure to carry its initial burden at summary judgment – to warrant a trial on the merits of Skop's municipal liability claims.

## V.  CONCLUSION

For the within and foregoing reasons, Skop respectfully requests that the Court deny

summary judgment to the Defendants and set this matter down for jury trial on its next

available calendar.

Respectfully submitted,

/s/ William J. Atkins
WILLIAM J. ATKINS
State Bar No.  027060
*Counsel for Plaintiff*

**PARKS, CHESIN & WALBERT, P.C.**
75 Fourteenth Street, N.E., Suite 2600
Atlanta, Georgia 30309
Telephone:   (404) 873-8000
Facsimile:   (404) 873-8050

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **LAURA SKOP** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **FILE NO.: 1:05-CV-1754-BBM** |
| | : | |
| **CITY OF ATLANTA, GEORGIA,** | : | |
| **OFFICER TIMOTHY BROWN,** | : | |
| **in his individual capacity, &** | : | |
| **SERGEANT THOMAS L.** | : | |
| **PADGETT, in his individual** | : | |
| **capacity,** | : | |
| | : | |
| **Defendants.** | : | |

---

## CERTIFICATE OF SERVICE AND TYPE

I hereby certify that I have prepared the foregoing document:  **Plaintiff Laura Skop's**

**Brief in Opposition to the Defendants' Motion for Summary Judgment** in *Book Antiqua*

*– 13 point font* in accordance with Local Rule 5.1(C), and have filed the same with the Clerk

of Court using the CM/ECF system which will automatically send email notification of such

filing to the following attorneys of record:  *Dennis Young & Cleora Anderson, City of*

*Atlanta Law Department, 68 Mitchell St., SW, Suite 4100, Atlanta, Georgia 30335-0332.*

*– Signature on following page –*

This 15th day of June, 2006.

/s/ *William J. Atkins*
WILLIAM J. ATKINS
State Bar No. 027060

PARKS, CHESIN & WALBERT, P.C.
26th Floor, 75 Fourteenth Street
Atlanta, Georgia 30309
Telephone: (404)873-8000
Facsimile: (404)873-8050
E-mail: batkins@pcwlawfirm.com